## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| MELVIN COUCH on behalf of himself and all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>WILCO LIFE INSURANCE COMPANY, a corporation f/k/a CONSECO LIFE INSURANCE COMPANY,<br><br>　　　　Defendant. | Case No.: 1:18-cv-1774<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

1.     Plaintiff Melvin Couch ("Plaintiff"), by and through his undersigned counsel, brings this lawsuit on behalf of himself and all others similarly situated against Wilco Life Insurance Company ("Wilco"). Plaintiff alleges as follows based on personal knowledge concerning all facts related to himself, and on information and belief concerning all other matters:

## NATURE OF THE ACTION

2.     This case arises from Wilco's breach of the express and implied contractual obligations contained in its universal life insurance policies, a type of life insurance said to offer more flexibility than traditional "term" and "whole" life policies. Under a universal life insurance policy, a policyholder will deposit premiums into an accumulation account. In turn, a life insurance company, like Wilco, will withdraw a monthly deduction from each policyholder's account and deposit a separate amount of interest based on the amount of money in the policyholder's accumulation account. Interest accrues on the account's balance based upon minimum and average annual rates guaranteed by each policy. Generally, universal life insurance policies allow policyholders to alter the amount and frequency of their premium payments as long as they meet their planned premium payment.

3.     In the 1980s and 1990s, Wilco (on its own or through its predecessors-in-interest) sold hundreds of millions of dollars in universal life insurance policies under which it agreed to credit policyholders' accumulation accounts at guaranteed annual rates generally between 3.0% and 8.0%. Plaintiff and other class members (as defined below) purchased the policies so that they and their families would be protected as they entered their senior years and in the event of death.

1

4.     Recently, however, Wilco began increasing premiums and monthly deductions withdrawn from the policies' accumulation accounts to impermissibly (a) subsidize its cost of meeting its interest rate guarantees under the policies; (b) recoup past losses stemming from poor business management, self-dealing, and litigation; and (c) induce policy terminations by policyholders. Wilco did this despite the policies containing no provision, mechanism, or authority to increase monthly deductions beyond the agreed-upon Planned Premium (defined below), as well as Wilco's express and implied obligation to only base the monthly deduction on the relative risk of insurance (i.e., expectations as to future mortality experience) and other static factors.

5.     By violating its contractual duties, Wilco was able to enrich itself at the expense of its policyholders, either by charging those policyholders higher premiums and monthly deductions, or by causing policyholders to be unable or unwilling to pay the higher costs. If a policyholder is unable or unwilling to pay the higher costs, Wilco benefits because the policies will lapse, eliminating Wilco's exposure while enabling Wilco to keep for itself years' worth of the premiums that policyholders have already paid.

6.     As a result of Wilco's actions, thousands of class members were and continue to be faced with an impossible choice: either pay exorbitant and improper increases that cannot be justified by the ultimate death benefits of the policies and that violate the policies, or surrender or lapse on the policies and walk away from years or decades of premium payments.

7.     As described more fully below, Wilco's substantial increase of premiums and monthly deduction charges breached its contractual obligations. Plaintiff seeks injunctive and equitable relief, as well as ancillary damages, to halt and reverse Wilco's misconduct. These increases have already injured Plaintiff and class members, and if allowed to proceed, will

continue to cause irreparable injury to Plaintiff and class members.

## THE PARTIES

8.     Plaintiff Melvin Couch is 67 and resides in Butler, Alabama. On July 24, 1987, Nonparty Lamar Life Insurance Company ("Lamar Life") issued to Plaintiff, as the owner and insured, a universal life insurance policy, Policy No. 000511319. Plaintiff's policy had an initial specified amount of $100,000, plus certain rider benefits, and was recently subjected to monthly deduction increases by Wilco.

9.     Upon information and belief, Lamar Life subsequently sold Plaintiff's policy to Wilco or one of Wilco predecessors-in-interest, or alternatively, Lamar Life merged into or was otherwise acquired by Wilco or one of Wilco's predecessors-in-interest. Wilco assumed all liability for Plaintiff's policy as if it had been issued originally by Wilco.

10.     Defendant Wilco is a corporation organized under Indiana law, with its principal place of business located at 12821 E. New Market Street, Suite 250, Carmel, Indiana 46032. Wilco was formed in or about 1962, and originally did business as Massachusetts General Life Insurance Company ("Massachusetts Life").  The Registered Agent for Service of Process for Wilco is Corporation Service Company, 135 N. Pennsylvania St., Suite 1610, Indianapolis, IN 46204.

11.     In 1996, Conseco, Inc. acquired Massachusetts Life, and Massachusetts Life moved to Indiana and changed its name to Conseco Life Insurance Company ("Conseco Life").

12.     On July 1, 2014, Wilton Reassurance Company ("Wilton Re") acquired Conseco Life, and in October 2015, Conseco Life again changed its name to Wilco. Wilco now operates as a wholly-owned subsidiary of Wilton Re.

## JURISDICTION AND VENUE

13.    This Court has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Minimal diversity exists between members of the class and Wilco: Wilco is a citizen of Indiana, and Plaintiff is a citizen of Alabama. The amount in controversy in this action exceeds $5,000,000 and there are more than 100 members of the Class.

14.    This Court has personal jurisdiction over Wilco because Wilco is incorporated in Indiana, and Indiana is Wilco's principal place of business and is where Wilco is headquartered. Alternatively, Wilco is engaged in systematic and continuous business activity in Indiana, has sufficient minimum contacts in Indiana, or otherwise intentionally avails itself of the Indiana consumer market through promoting, marketing, distributing, and selling insurance policies, including the universal life insurance policies at issue in this case. Those actions render the Court's exercise of jurisdiction over Wilco appropriate under traditional notions of fair play and substantial justice.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391. Wilco resides and has its principal place of business in this District; hundreds of class members reside in this District; a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in this District; and Wilco entered into transactions and received substantial profits in this District.

16.    All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

**A.    Universal Life Insurance Policies**

17.    Traditionally, life insurance companies sold two types of policies: term and whole life insurance. Term life insurance is issued for a term of years, normally building up no cash value and expiring without value. Whole life insurance provides coverage for life and provides an increasing cash value that is available when needed. The premiums remain the same throughout the life of the policy.

18.    Universal life insurance, on the other hand, supposedly provides more flexibility than whole or term life insurance. Premium payments, which are variable, are deposited in an accumulation account from which monthly cost of insurance and expense charges are deducted. The accumulation account is credited with monthly interest at a nonguaranteed declared rate, but not less than the guaranteed interest rate specified in the policy. Universal life insurance policies generally allow policyholders to change the amount and frequency of premium payments as long as they make their planned periodic premium and their policy contains sufficient cash value to cover monthly deductions.

19.    In 1981, major life insurance companies entered into the universal life insurance market, and by the end of 1983, virtually all major insurers had introduced at least one universal life product.[1] Universal life policies accounted for more than 25% of all individual life-insurance sales for much of the 1980s, when 10-year Treasury yields peaked at 15%.[2]

---

[1] Douglas C. Doll, *A Brief History of Universal Life*, SOCIETY OF ACTUARIES, (Jan. 1999), https://www.soa.org/News-and-Publications/Publications-Browse/Monographs/1999/1999-01-ABrief-History-of-Universal-Life.aspx.

[2] Leslie Scism, *Retirees Stung by "Universal Life" Cost*, WALL STREET JOURNAL (Aug. 9, 2015), http://www.wsj.com/articles/cost-of-universal-life-insurance-stings-retirees-1439172119.

20.    Consumers in the 1980s and 1990s were attracted to universal life policies because of historically high interest rates. Calculated premiums were based on optimistic interest rate assumptions, most of them guaranteeing at least 4%. High interest rates meant that policyholders did not expect to pay much to fund the policy in their more senior years because the interest would cover future expenses.

21.    Today interest rates are at an all-time low, making it difficult for insurers to credit the rates the insurers promised when they sold the policies 20 years ago. As a result, insurance companies are suffering losses due to these universal life insurance policies, and their attempt to fix the problem consists of impermissibly raising premiums and cost of insurance charges.

22.    Wilco's policies include the cost of insurance in its "Month's Deduction," along with the "the cost of optional benefits" and a policy fee. *See* Exhibit A, Lamar Policy at 11 ("Ex. A").[3] The cost of insurance charge is important to universal life policyholders for at least two reasons: (1) the cost of insurance charge is typically the highest expense that a policyholder pays; and (2) the cost of insurance charge is deducted from the accumulation account (i.e., the savings component) of the policy, so the policyholder forfeits the cost of insurance charge entirely to Wilco. Wilco's recent cost of insurance rate increases have made it impossible for policyholders—especially those at retirement age—to afford their payments and keep the policies in effect.

---

[3] Upon Plaintiff's request for a copy of his policy, Wilco provided a specimen copy of the policy but omitted including the first three (3) pages of the policy. Upon information and belief, the first three pages include: a front cover, index of policy provisions, and a policy data page, which contains, among other things, the policyholder's issue age, death benefit selection, and planned premium amount and frequency.

**B.      Wilco's Standardized Policy Terms**

23.    Plaintiff brings this class action on behalf of himself and other owners and former

owners of universal life insurance policies issued and administered by Wilco (with certain

exceptions as alleged below). The policies use standardized, materially uniform language with

respect to the policy provisions at issue in this action.

24.    Many of the policies were originally issued in the 1980s and 1990s. The policies

impose a continuing obligation on Wilco to perform its contractual obligations, generally stating

"[a]s the Owner, you have all the rights given by this policy." *See* Ex. A at 5.

25.    The policies contain a savings component and investment income to the owner of

the policy during his or her lifetime based on the premiums that are paid into each policy's

accumulation account. For example, the Lamar Life policies provide that:

> 1.      Premiums are amount of money you pay use to keep this
> policy in force. Your Premium payments are flexible. This
> means that you can choose the timing and amount of your
> Premium payments, subject to the restrictions in this
> section.

> 2.      Your choice regarding timing and amounts of Premiums
> will affect the Accumulated Value and Cash Surrender
> Values the policy. In the event you stop paying Premiums,
> the timing and amount of Premiums you had already paid
> will affect the length of time the policy will stay in force
> and, in certain cases, the amount of the Death Benefit. The
> mechanics governing this and an explanation of the Cash
> Surrender Value are found in the section entitled "V CASH
> SURRENDER    VALUE    AND    ACCUMULATED
> VALUE."

> ***

> 4.      PLANNED PREMIUMS are those you intend to make at
> regular intervals. Planned Premiums may be paid as long as
> this policy is in force before the Insured's death. You chose
> an amount and frequency for your Planned Premiums. Your
> choice is shown on the Schedule Page.

*\*\**

     7.    UNSCHEDULED PREMIUMS are Premiums you pay us after issue which are not Planned Premiums. We have limits on the maximum frequency and maximum amount of Unscheduled Premiums which we will accept. Within these limits, you may pay Unscheduled Premiums at any time this policy is in force before the Insured's death.

Ex. A at 6.

     26.    The policies do not permit Wilco to increase the agreed-upon Planned Premiums or increase the monthly deduction to levels beyond the Planned Premium. In *Pate v. Conseco Life Insurance Company*, 971 So.2d 593 (Miss. 2008), the Supreme Court of Mississippi held—after reviewing an identical or near-identical Lamar Life universal life insurance policy—that "Conseco fails to point to any language contained in the policy which would allow for an increase in the planned monthly premium. Therefore, we find that terms of the contract plainly and unambiguously support [the plaintiff] and should be construed as written." *Id.* at 595-597.

     27.    The policies refer to the accumulation account as "Accumulated Value," and generally speaking, "On any monthly Anniversary after the Policy Date, [Wilco] calculate[s] the policy's Accumulated Value as follows:

- Add: (1) the Accumulated Value on the prior Monthly Anniversary, (B) Net Premiums for any Gross Premiums [Wilco] receive[s] during the Policy Month, and (C) interest credited for the Policy Month.

- Then subtract: (D) the Month's Deduction and (E) any Partial Surrenders charged during the Policy Month.

Ex. A at 12.

     27.    The policies further provide that Wilco will credit interest on the policy's Accumulated Value at a guaranteed rate: "[Wilco] guarantee[s] that the minimum interest rate

we will use in calculating Accumulated Values is equivalent to [4.5]% per annum, compounded annually. [Wilco] may apply a different interest rate to that part of the Accumulated Value that equals the outstanding Policy Loan Balance than we do for the rest of the Accumulated Value than we do for the rest of the Accumulated Value but such rate will never be less than [4.5]%." Ex. A. at 12, ¶ 21.

28.    Under the policies, Wilco withdraws a charge known as the "Month's Deduction." "The Month's Deduction pays the cost of the policy for the previous Policy Month. The items which make up the Month's Deduction are:

- the cost of insurance for the Policy Month;

- the cost of optional benefits, if any, which you have added to the base policy; and

- the POLICY FEE of not more than $6.00."

Ex. A at 11.

29.    The "cost of insurance" is by far the most important component of the Month's Deduction. Even small changes in the monthly cost of insurance rate can produce a dramatic increase in the dollar amount of the monthly cost of insurance charged by Wilco, particularly for elderly insureds. The higher the monthly cost of insurance rate, the greater the premiums required to maintain a positive balance in the accumulation account and avoid a lapse of the policy.

30.    Under the policies, the cost of insurance component of the Month's Deduction is based on projections of life span established by the 1958 Commissioner's Standard Ordinary ("CSO") Mortality Tables. Ex A at 17, ¶ 15. The other guaranteed values for the policies—minimum Accumulated Values, Cash Surrender Values, reserves for future benefits—are also based on the 1958 CSO Mortality Tables. *Id.*

9

31.    Although the policies include a table of guaranteed monthly cost of insurance rates which Wilco cannot exceed, Wilco assures policyholders that the cost of insurance will increase uniformly for similarly situated policyholders and only based on static factors, stating:

> The COST OF INSURANCE RATE is the amount charged monthly per $1,000 of Net Amount of risk. [Wilco] guarantees a maximum Cost of Insurance Rate for each Sex, Attained Age, and Risk Class Rating. Some tables of these guaranteed maximum Cost of Insurance Rates are found in the Section entitled 'XI Appendix 2.' Rates for flat extra ratings are determined by adding the flat extra per thousand to the maximum rate from the tables which would be applicable if there were no flat extra rating. Any change in the monthly Cost of Insurance Rate will be applied on a uniform basis for Insured of the same Age at Issue, Sex, Risk Class Rating, Duration and Specified Amount.

Ex. A at 23, ¶ 9 (emphasis added).

32.    Therefore, to the extent Wilco can increase cost of insurance rates, it can only do so based on a limited set of factors, including Risk Class Rating, which focuses on the policyholder's mortality risk. Under the policies:

1.    A RISK CLASS RATING is a rating determined by [Wilco's] Underwriting Department, reflecting the relative risk of insurance. One Risk Class Rating is said to be 'lower cost' than another if it yields a lower assessment of the risk than the other. A risk Rating may be of two kinds: a table rating or a flat extra rating.

2.    A 'table' rating is designated by a letter, from A to P, or by the words 'Standard' or 'Non-smoker.' Each successive letter of the alphabet reflects a 25% increase in our assessment of the risk, as opposed to the 'Standard' mortality table. 'Non-Smoker' designates our lower assessment of the mortality risk for non-smokers.

3.    A 'flat extra' rating is a special type of rating used to recognize certain types of additional risk. These risks are those which our Underwriting Department assesses as causing a constant addition to the mortality, regardless of Attained Age. Flat extra ratings may be permanent or temporary.

10

Ex. A at 22.

33.    In the event a policyholder fails to make sufficient premium payments to cover the

Month's Deduction, a policyholder will enter a two-month grace period. Pursuant to the policies:

> If the policy's Cash Surrender Value, minus the value of any
> Policy Loan Balance less unearned interest, on any Monthly
> Anniversary, is not enough to cover the Month's Deduction for the
> next Policy Month, the policy will enter its Grace Period. The
> Grace Period is the next **two (2) Policy Months** after this Monthly
> Anniversary. If you do not pay enough Premium during the Grace
> Period to cover any amounts required, then this policy will
> automatically terminate at the end of the Grace Period. It will then
> have no Cash Surrender Value.

Ex. A at 12.

34.    Wilco's prior effort to cite the grace period policy provision to justify premium

and cost of insurance rate increases has been rejected. In *Pate*, the court reviewed near-identical

language and determined that the policies forbid premium increases, stating "the policy does not

unambiguously and/or clearly state any terms for an increase in the monthly planned

premium[.]" *Pate*, 971 So.2d at 595-596. The court further found, even if it credited Wilco's

interpretation of the grace period provision, it would create an ambiguity with respect to other

provisions of the policies that would have to be construed against Wilco (then doing business as

Conseco). *Id.* at 594-95.

35.    Furthermore, the policies are "Non-Participating," meaning they do "not

participate in any of [Wilco's] earnings or surplus." Ex. A. at 18. By that same token, because

the benefits of the policies are not contingent on Wilco's prior performance, Wilco cannot pass

or offset its past losses onto its policyholders.

36.    As a result of the foregoing policy provisions, Wilco cannot increase agreed-upon

Planned Premiums, and it cannot increase cost of insurance rates beyond Planned Premiums to

indirectly increase premiums.

37.    Likewise, Wilco's discretion to set or increase the monthly cost of insurance rate is strictly tied to fixed factors, including Wilco's estimations of future mortality experience (i.e., Age and Risk Class Rating) and the mortality tables underlying the policies' guaranteed maximum insurance rates. *Id.* at 5A, 5B. Past or projected performance cannot form the basis of a cost of insurance rate increase.

38.    The policies also do not authorize Wilco to do any of the following:

- Set or increase the monthly cost of insurance rate in whatever amount or by whatever method it determines;

- Set or increase monthly cost of insurance rate to recoup past losses, including past losses on the policies based on changes in interest rates, policy lapse rates, or other experience factors;

- Set or increase monthly cost of insurance rate to recoup losses due to diminished returns on Wilco's general investment portfolio; and

- Set or increase monthly cost of insurance rate in order to negate or offset Wilco's obligation to pay credited interest to the policies at the minimum guaranteed rates.

39.    A reasonable policyholder would construe the standardized policy language to mean that the monthly cost of insurance rate, which is based on Wilco's expectation as to future mortality experience and based on the 1958 CSO Mortality Tables, would not change except for a verifiable, material adverse change in the underlying mortality rates used to price the policies. As reflected in every subsequent version of the CSO Mortality Tables, mortality rates have only improved in the years since the policies were issued.

40.    A reasonable policyholder would also construe (i) the policies' provisions governing the payment of guaranteed interest on the Accumulation Value, and (ii) the policies' provisions governing the monthly cost of insurance rate, as operating independently of one

another, thereby precluding Wilco from offsetting or subsidizing its interest obligations through increasing premiums and the cost of insurance.

41.    In the alternative, the policies are at a minimum ambiguous with respect to whether Wilco can increase the monthly cost of insurance rate for any reason other than an adverse change in mortality rates or the relative risk of insurance or to levels that exceed agreed-upon Planned Premiums. Any ambiguity in the policies must be construed against Wilco and in favor of policyholders like Plaintiff.

**C.    Wilco's Monthly Deduction Rate Increase**

42.    Recently, Wilco substantially increased the policies' monthly cost of insurance rates, resulting in a substantial increase in the amount taken from policyholders' accumulation accounts, the premiums necessary to maintain coverage under the policies, and at some point, causing the surrender or lapse of a substantial number of policies.

43.    For example, Wilco significantly raised Plaintiff's Premiums and monthly cost of insurance rate. When Plaintiff purchased his policy in 1987, he agreed to pay a Planned Premium payment of $81.00 per month, which was to be automatically deducted from his bank account. *Id.* At the time the policy was issued, Plaintiff was assured by Wilco's agents that his premium would never increase and that the policy would not only offer a death benefit but would also provide investment income in the form of guaranteed monthly interest.

44.    Despite Defendant's contractual obligations and its representations to Plaintiff, Wilco consistently raised his premium and cost of insurance rates far above the initial agreed-upon Planned Premium and to an amount Plaintiff could no longer afford.

45.    The annual increase in premiums and cost of insurance rates has been staggering, particularly in recent years:

| | Monthly Deduction | Annual Cost |
|---|---|---|
| July 2009 | $102.48 | $1,229.76 |
| July 2010 | $113.59 | $1,363.08 |
| July 2011 | $125.86 | $1,510.32. |
| July 2012 | $136.66 | $1,639.92 |
| July 2013 | $152.00 | $1,824.00 |
| July 2014 | $168.64 | $2,023.68 |
| July 2015 | $188.00 | $2,256.00 |
| July 2016 | $211.20 | $2,534.4 |
| July 2017 | $225.00 | $2,700.00 |
| July 2018 | $274.00 | $3,288.00 |

Exhibit B, Plaintiff's Annual Statements from July 23, 2009 to July 24, 2027 ("Ex. B at ___"); Exhibit C (Grace Period Letters). In total, Plaintiff's premiums increased from the initial agreed-upon $81.00 to $274.00 per month, representing an annual increase of $2,316. Worse yet, Wilco has informed Plaintiff his premiums and cost of insurance rate will increase further going forward, beginning with an increase to $299 after July 24, 2018, and an increase to $326 after July 2019. Ex. C.

46.     Instead of timely disclosing the increases to Plaintiff and other policyholders, Wilco would take for itself the increased costs from the policyholders' Accumulated Value (the policy's cash value) and only after Wilco had taken the cash from, and depleted, that account would Wilco send a Grace Period Letter to the policyholder demanding a payment to keep the policy in force.

47.     Due to the foregoing practices and Wilco's projections, Plaintiff's policy has lapsed and terminated without cash value despite decades of dutifully paying premiums and Plaintiff's inability to qualify for similar universal life insurance from Wilco or its competitors.

48.     Unless enjoined, Wilco will leave Plaintiff and other policyholders without the insurance coverage for which they have paid and will continue its practice of causing more lapses. These widespread terminations—also known as "shock lapses"—will in turn benefit

Wilco because it will not have to pay out the death benefits on Policies for which Plaintiff and class members have paid the premiums for years.

**D.      Wilco's True Reasons for the Monthly Cost of insurance rate Increase**

49.      The sudden and dramatic cost of insurance rate increase is not based on material adverse changes in Wilco's relative risk of insurance, but instead on Wilco's desire to avoid its contractual obligation to meet its guaranteed interest obligation, as well as its desire to recover past losses and shed exposure on millions of dollars of outstanding policies.

**1.      Wilco Suffered Massive Losses Due to the Self-Dealing of Its Corporate Parent and Other Affiliates**

50.      For most of the time relevant to this action, Wilco was known as Conseco Life, and the policies at issue were administered by Wilco's then-indirect corporate parent, CNO Financial Group, Inc. (formerly known as Conseco, Inc.) ("CNO Financial"), and CNO Services, LLC (formerly known as Conseco Services, LLC) ("CNO Services"), a subsidiary of CNO Financial. As used below, "Conseco" refers collectively to Conseco Life, CNO Financial, and CNO Services.

51.      Along with other insurance companies in the CNO Financial family, Conseco Life was operated from above, with little regard for Conseco Life's own wellbeing or the wellbeing of its policyholders. CNO Financial's management made or directed all major decisions on behalf of Conseco Life. On a day-to-day basis, CNO Services implemented most decisions relating to company overhead and administration, and it did so under the direction of CNO Financial. CNO Financial completely dominated Conseco Life, and ignored Conseco Life's existence as a separate entity.

52.      Conseco Life paid to CNO Financial tens of millions of dollars in dividends it could not afford. In one year alone, Conseco Life's dividend payment exceeded its net earnings

by more than $86 million. Decisions about whether to pay dividends or whether to enter into exorbitantly priced service contracts were all made at the CNO Financial level, not the Conseco Life level. Conseco Life's ostensible decision makers were also CNO Financial officers and/or employees or officers of CNO Services.

53.    Among numerous examples of Conseco Life's self-destructive deference to CNO Financial, the most egregious involve the overhead expenses and service fees charged to Conseco Life by CNO Services and its affiliates. Conseco depleted Conseco Life's assets by requiring Conseco Life to enter into non-arms-length transactions with other CNO Services subsidiaries, to Conseco Life's substantial financial detriment.

54.    CNO Financial dictated that Conseco Life pay grossly inflated fees to CNO Services and other CNO Financial affiliates as overhead and for services rendered in managing Conseco Life and its investments. Conseco Life began paying those massively inflated overhead charges and fees when Conseco Life and CNO Services (then known as Conseco Services, LLC) entered into an "Insurance Services Agreement" in January 1997. Over the next decade, and continuing until shortly before CNO Financial's recent sale of Conseco Life to Wilton Re in 2014, CNO Financial and CNO Services required Conseco Life to pay massively inflated sums that left Conseco Life teetering on the brink of financial failure and regulatory takeover.

55.    CNO Financial decided that CNO Services would charge Conseco Life for overhead based on Conseco Life's "ability to pay" rather than on any fair valuation of the services and other benefits provided. When Conseco Life was flush with cash, CNO Financial directed CNO Services to take the available cash. The amount of overhead "allocated" to Conseco Life could and did increase or decrease by tens of millions of dollars from year to year based on the whims of CNO Financial and CNO Services.

16

56.     The intra-family fees Conseco Life paid to CNO Services functioned as huge *de facto* dividends that Conseco Life could not actually afford to pay, and could not pay under state insurance laws. For a brief period of time, when Conseco Life's cash reserves had been so dangerously depleted as to place Conseco Life at risk of a regulatory takeover, CNO Financial directed CNO Services to reduce the amounts it charged Conseco Life—and directed CNO Services to impose corresponding increases on other members of the Conseco Insurance Group that had more available cash at the time. By then, much of the damage had been done. CNO Financial had already bled Conseco Life nearly dry.

57.     Between 1997 and 2012, Conseco Life's transfers to other CNO subsidiaries and affiliates totaled $954.7 million as follows:

| Year | Amount Transferred |
|------|--------------------|
| 1997 | $ 1,846,000 |
| 1998 | $ 1,590,000 |
| 1999 | $ 120,591,000 |
| 2002 | $ 96,632,000 |
| 2003 | $ 51,899,000 |
| 2004 | $ 79,723,000 |
| 2005 | $ 66,102,000 |
| 2006 | $ 58,035,000 |
| 2007 | $ 53,934,000 |
| 2008 | $ 56,647,000 |
| 2009 | $ 49,260,000 |
| 2010 | $ 50,327,000 |
| 2011 | $ 67,148,000 |
| 2012 | $ 66,328,000 |
| **Total:** | **$954.7 million** |

58.     Intra-family payments by Conseco Life far exceeded industry norms. In some years, for example, Conseco Life's payments to CNO Services were double or even triple the industry average (calculating expense payments as a percentage of amounts paid to policyholders). Comparing industry norms to the inflated amounts charged by CNO Services, it appears that, in the aggregate, CNO Services overcharged Conseco Life by between <u>$414 million</u>

and  $756 million, from 1999 to 2012.

59.    The table below compares the amounts paid by Conseco Life to the amount it would have paid based on the peer-group median:

| | Conseco Life's Actual Payments for General Expenses, 1997-2012 | Conseco Life's Total Projected General Expenses Using Peer Company Median Ratio, 1997-2012 | Conseco Life's Overpayment of General Expenses Compared to Peer Company Median Ratio, 1997-2012 |
|---|---|---|---|
| General Expenses/ Net Admitted Assets | $1,360.6 million | $946.1 million | **$414.5 million** |
| General Expenses/ Capital & Surplus | $1,360.6 million | $473.5 million | **$887.1 million** |
| Affiliate Payments/ Net Admitted Assets | $954.7 million | $389.4 million | **$565.2 million** |
| Affiliate Payments/Capital & Surplus | $954.7 million | $198.7 million | **$756.0 million** |

60.    CNO Financial was able to loot Conseco Life as it did because Conseco Life had no employees of its own, and it had no independent management. Because of Conseco's management structure, neither Conseco Life nor CNO Services had any true ability to act independently of CNO Financial. In theory, Conseco Life's corporate officers had management authority and were supposed to make sure that Conseco Life made decisions consistent with its duties to policyholders. But in practice, because all of Conseco Life's officers simultaneously served as officers, directors or employees of CNO Financial, CNO Services, and/or other CNO Financial affiliates, they made decisions affecting all of the companies in the Conseco Insurance Group, including Conseco Life. Conseco Life's directors likewise were hand selected members of CNO Financial and/or CNO Services management, ultimately beholden and loyal only to CNO Financial.

61.    Because of CNO Financial's domination of Conseco Life, the payment of dividends up from Conseco Life, and—more importantly—the terms of service contracts

between Conseco Life and its corporate affiliates, including CNO Services, followed patterns wholly inconsistent with business dealings by companies engaged in arm's length transactions.

62.    By the time Wilton Re acquired Conseco Life in 2014, Conseco Life was a husk of its former self due to the wanton self-dealing of its corporate parent and affiliates. The money wrongly diverted to Wilco's former corporate family should have been held and invested for the benefit of policyholders like Plaintiff. Wilco now seeks to recover the money reaped by and lost to Conseco by significantly raising monthly cost of insurance rates and by causing policyholders to either lapse on—or surrender—the policies they responsibly maintained for decades.

### 2.    Litigation Involving Wilco's Insurance Policies Causes Wilco Further Significant Losses

63.    In addition to the exorbitant losses associated with Conseco's self-dealing, Wilco experienced substantial losses relating to private and regulatory litigation concerning the administration of its "Lifestyle," "Lifetime," "LifeTrend," "ValueLife," and "ValueTerm" life insurance policies.

64.    In 2003 and 2004, Wilco (then doing business as Conseco Life) changed the way it calculated cost of insurance charges on approximately 86,500 Lifestyle and Lifetime insurance policies, resulting in a slew of class action lawsuits—and ultimately a multidistrict litigation—alleging breach of contract, breach of the covenant of good faith and fair dealing, and various claims for fraud. *See generally In Re Conseco Life Insurance Co. Cost of Insurance Litigation*, No. 04-md-1610 (C.D. Cal.) ("Lifestyle Litigation"). In 2005, the court certified a nationwide class for breach of contract and injunctive relief, and in 2007, Wilco settled the lawsuits. CNO Financial noted in its 2007 Form 10-K that it "incurred total costs related to [the] litigation settlement of $64.4 million, $174.7 million, and $18.3 million in 2007, 2006, and 2005, respectively."

65.    The Lifestyle Litigation settlement does not cover Plaintiff's claims.

66.    In 2008, Wilco faced more litigation, this time concerning its LifeTrend policies, which were sold by Wilco or through one of its predecessors-in-interest in the 1980s and 1990s. LifeTrend policies contained an optional premium payment provision ("OPP"), which was widely described by Wilco employees, independent brokers, and policyholders as a "vanishing premium" provision. Moreover, LifeTrend policies also contained a guaranteed cash value table that listed the minimum amount that Wilco promised to pay the policyholder upon surrender of the policy, an amount described as the policy's "guaranteed cash value" ("GCV"). The GCV amounts listed in the GCV table depended on the number of years for which the policy had been in force.

67.    Each LifeTrend policy's OPP provision allowed the policyholder to stop paying annual premiums after five years so long as the amount of money in the policy's accumulation account exceeded the sum of the policy's GCV plus the applicable surrender charge and any indebtedness. If a policy became "underfunded,"—i.e., if the accumulation account balance fell below that threshold—then Wilco could resume charging annual premiums. By contrast, if a policy was not underfunded—i.e., if the accumulation account balance exceeded the sum of the GCV, applicable surrender charges, and any indebtedness—then Wilco could not resume charging annual premiums.

68.    However, in October 2008, LifeTrend policyholders who had paid the required premiums and elected to enter the OPP program received a letter from Wilco demanding "shortfall payments" amounting to several years' worth of newly-announced, retroactively imposed, annual premiums (the "October 2008 Letter"). For many LifeTrend policyholders, the shortfall payments that Wilco demanded were in the tens of thousands of dollars. Wilco also

used a new method for calculating OPP/vanishing premium eligibility and told policyholders that they would owe substantial premiums going forward. As with this case, Wilco ignored its contractual obligations, sought to offset its interest obligations, and recover prior losses.

69.    Furthermore, like this case, Wilco expected and intended when it announced the increases in premiums and cost-of-insurance deductions that thousands of LifeTrend policyholders would respond to the shock of the massive increases by surrendering their Policies or letting them lapse. Before, during, and after its implementation of the shock lapse strategy, CNO Financial hired actuarial experts at Milliman USA ("Milliman") to estimate the effect of the administrative changes on Wilco's bottom line. Milliman's estimates of the financial benefits Wilco would reap by breaching the LifeTrend policies varied based on assumptions used, but they all exceeded $100 million. Milliman attributed one-third to one-half of the anticipated benefit to Wilco to shock lapse—value transferred directly from thousands of former LifeTrend policyholders, who no longer would have their life insurance policies, to Wilco, which would be relieved of the obligation to pay death benefits on those policies. The actual lapse rate ended up exceeding 39%. Ultimately, more than 4,000 LifeTrend policyholders—over a third of LifeTrend policyholders—surrendered their policies or let them lapse in the two years following the October 2008 announcement.  Wilco achieved its improper shock lapse objective.

70.    Unsurprisingly, LifeTrend policyholders across the country approached attorneys seeking to challenge Conseco Life's unlawful conduct, resulting in class action lawsuits across the country that were eventually coordinated into multidistrict litigation in the United States District Court, Northern District of California, *In re Conseco Life Insurance Co. LifeTrend Insurance Sales and Marketing Litigation*, 10-cv-02124-SI (N.D. Ca.) ("LifeTrend Litigation").

71.    During the LifeTrend Litigation, the court granted a preliminary injunction in part

(Dkt. 369), certified a nationwide class (Dkt. 451), granted the plaintiffs' motion for summary judgment in part (Dkt. 495), and denied Wilco's motion for summary judgment in its entirety (Dkt. 495). In denying that motion for summary judgment, the Court found that (a) "a reasonable insured would not read the terms [of the LifeTrend policies] and believe that [Wilco] could amend the COI charges at its discretion, regardless of changes to mortality rates[;]" (b) "it would be a breach of [the LifeTrend policies] for [Wilco] to collect a charge called 'cost of insurance' that is not actually related to the cost of insurance and is instead related to 'expenses,'. . . or to make up a shortfall in [Wilco's] ability to pay out the guarantee[;]" and (c) it would be a breach of the policies "to pass [Wilco's] bad fortunes onto its customers." LifeTrend Litigation, Dkt. 451 at 11-17.

72.    In November 2014, the Court in the LifeTrend Litigation approved a substantial final settlement between Wilco and a nationwide class of LifeTrend policyholders. Along with the $27 million estimated value of the settlement terms, Wilco paid $8 million dollars in administrative costs and payments to class counsel and class representatives. LifeTrend Litigation, Dkts. 495, 505, 526.

73.    In addition to private lawsuits, LifeTrend policyholders also contacted state insurance regulators to express concerns about the additional COI and expense charges shortly after receiving the October 2008 letter. On May 28, 2010, Wilco reached a Regulatory Settlement Agreement ("RSA") with the various state regulators. Among other terms, the RSA required Wilco to create a $10 million settlement pool for the benefit of LifeTrend policyholders.

74.    The LifeTrend Litigation settlement does not cover Plaintiff's claims.

75.    Beginning in 2008, Wilco faced two lawsuits challenging proposed cost of insurance increases on Valulife and Valuterm universal life insurance policies, which Wilco or

its predecessors-in-interest had sold in the 1980s and 1990s. *See generally Yue v. Conseco Life Ins. Co.*, 08-cv-1506 (C.D. Cal.) ("*Yue I*"); *Yue v. Conseco Life Ins. Co.*, 11-cv-9506 (C.D. Cal.) ("*Yue II*") (collectively, "Valulife Litigation").

76.    In *Yue I*, in 2011, the court granted a declaratory judgment holding that a cost of insurance increase implemented by Wilco in 2002 breached the Valulife and Valuterm policies because "it [took] into account factors other than 'mortality.'" *Yue I*, Dkt. 168 at 14. The court also noted "[Wilco's] 'mortality experience' has been improving, not worsening . . . the expected mortality (rate of death) is not better than when [Wilco] originally priced and sold the Policies." *Id.* Therefore, Wilco could not lawfully increase its COI rates.

77.    In *Yue II*, plaintiffs brought, among other things, breach of contract claims, alleging that Wilco impermissibly increased COI rates in 2011 despite the fact that the policies at issue "prohibited changes in COI rates for reasons other than worsening mortality." *Yue II*, Dkt. 135 ¶ 10. Plaintiffs also alleged that Wilco attempted "to evade" the court's declaratory judgment in *Yue I* by "concoct[ing] yet another new 'methodology'" for determining COI charges. *Id.* at ¶ 12.

78.    In early 2013, Wilco reached a preliminary settlement with the Valulife Litigation plaintiffs, and the Court approved a nationwide settlement in July 2013. *Yue II*, Dkt. 208. The parties' experts valued the settlement's then-present value at $65 million dollars or more (*Yue II*, Dkt. 183 at 51-51), and Wilco was further required to pay class counsel (i) $7,098,916.46 in attorneys' fees, and (ii) $901,083.54 for expenses class counsel had incurred as a result of the Valuelife Litigation. *Yue II*, Dkt. 208 3-4.

79.    The Valulife Litigation settlement does not cover Plaintiff's claims.

80.    Wilco's litigation losses included substantial settlements, attorneys' fees, and

other expenses, as well as the severe loss of goodwill and corporate reputation. Rather than absorb the losses itself, Wilco now attempts to pass the costs to universal life insurance policyholders by dramatically increasing its premiums and monthly cost of insurance rates. Because this increase cannot be attributed to a material, adverse change in relative risk of insurance, it is impermissible and violates the terms of Wilco's universal life insurance policies.

3.      **Wilco Imposes the Premium and Monthly Cost of insurance rate Increases to Offset the Contractual Interest Payments It Owes to Policyholders and to Recoup Losses**

81.    Interest rates have declined over the last 15 years, falling to historic lows in the wake of the Great Recession. Although these steadily declining interest rates, which fell sharply during the Great Recession, have adversely impacted insurers generally, they have had extremely adverse consequences for the profitability of products, like the policies issued by Wilco, which have high guaranteed interest rates.

82.    In the late 1980s, when many of the policies were issued, the 10-year Treasury rate was around 9%. Throughout the 1990s the 10-year Treasury moved steadily downward, remaining at or above 5% until the post-2001 recession period when it pierced the 4% level for some months. Between 2003 and 2008 it fluctuated generally between 4% and 5%. Since mid-2008, however, the 10-year Treasury has been under 4%, hitting a low of 1.65% in 2012. In April 2012, the Center for Insurance Policy & Research ("CIPR") branch of the National Association of Insurance Commissioners published a report describing the effect on insurers of what was, even then, a prolonged period of low level interest rates. The CIPR Report warned:

> Life insurance companies face considerable interest rate risk given their investments in fixed-income securities and their unique liabilities. For life insurance companies, their assets and liabilities are heavily exposed to interest rate movements. Interest rate risk can materialize in various ways, impacting life insurers' earnings, capital and reserves, liquidity and competitiveness. Moreover, the

impact of a low interest rate environment depends on the level and type of guarantees offered. Much of the business currently on life insurers' books could be vulnerable to a sustained low interest rate environment . . . .

Life insurers typically derive their profits from the spread between their portfolio earnings and what they credit as interest on insurance policies. During times of persistent low interest rates, life insurers' income from investments might be insufficient to meet contractually guaranteed obligations to policyholders which cannot be lowered.

*** 

In a low interest rate environment, it is challenging to find relatively low-risk, high-yield, long-duration assets to match annuities that guarantee a minimum annual return (e.g., 4%). For many policies, low interest rates mean that some mismatch with assets is likely. For example, older fixed income insurance products that guarantee rates of around 6%—closely matching or conceivably even surpassing current investment portfolio yields— are likely to put a strain on life insurers as a result of spread compression or possibly negative interest margins.

83.    The low interest rate environment has persisted since 2012, exacerbating the spread compression and thus, as explained by the CIPR, undermining the profitability of policies with "guarantee rates around 6%."

84.    A recent report by actuary and Consumer Federation of America's James H. Hunt described how today's "climate of low interest rates" would impact insurers.[4] For more than 30 years Hunt has evaluated life insurance policies. His report prophetically warned:

While there has been occasional COI increases in the past, and there has been litigation on the issue, CFA is concerned that the actions taken may spread throughout the life insurance business . . . . We are concerned that COI rate increases will, in effect, void the interest rate guarantees in affected contracts The question is: Are these insurers in a climate of low interest rates using COI increases

---

[4] *See Life Insurance Regulators Should Block Cost of insurance rate Increases When Used to Avoid Guaranteed Interest Rates in Universal Life Policies, James Hunt*, found at http://www.consumerfed.org/pdfs/160121_CFACOIs_report.pdf. (Last checked Nov. 1, 2017).

> to maintain profits when the interest rates they have been crediting to cash values have been reduced to the contractually guaranteed rates, often 4%, sometimes higher?

*Id.* at 1.

85.    Through the premium and monthly cost of insurance increase, Wilco is seeking to offset or subsidize its credited interest guarantees through dramatic increases in the charges taken from the policyholders' cash value. In short, through the monthly cost of insurance rate increase, Wilco is attempting to avoid its obligation to credit the guaranteed interest rates under the policies—thereby denying policyholders their contractual benefits under the policies. If Wilco could increase the monthly cost of insurance rates to offset its interest obligations to policyholders, the interest credit provisions contained in Wilco's universal life insurance policies would be rendered meaningless.

### 4.    Wilco Seeks to Inflict Massive Shock Lapses Through the Monthly Cost of Insurance Rates and Premium Increases

86.    As alleged above, Wilco has saddled Plaintiff and other class members with the onerous premiums and monthly cost of insurance rate increases not because of any adverse change in the relative risk of insurance or other legitimate cost of insurance factors but, instead, to defray its contractual obligations to pay guaranteed interest under the policies and to recoup losses stemming from Wilco's own actions, including to cover the exorbitant expense of its former corporate family's self-dealing and the cost of litigation relating to its faulty administration of other policies. In an unconscionable disregard for the rights and interests of its—mostly elderly—policyholders, Wilco effectively let the policy reserves established to protect those policyholders slip away into the hands of its former corporate parent and affiliates, only to turn around and demand that the policyholders themselves restore the profitability of the policies to Wilco by paying significantly increased premiums and cost of insurance rates.

87. As with its prior tactics pertaining to its LifeTrend policies, Wilco also hopes to cause widespread policy lapses and surrender. The likelihood of a surrender or lapse increases dramatically when there is an increase in monthly cost of insurance rates, and the policyholder must decide whether he or she can afford to maintain the policy. Upon information and belief, Wilco has actively sought to encourage and provoke Plaintiff and other class members to terminate their policies or reduce the face amount of coverage enough to allow Wilco to collect the increased monthly cost of insurance charges.

88. Wilco was an already depleted insurance company when it was acquired by Wilton Re in 2014 due to Conseco's self-dealing and litigation costs, which caused Wilco hundreds of millions of dollars in losses. Moreover, due to the Great Recession and tumbling interest rates, the universal life insurance policies held by Wilco represented a significant burden for Wilco. Thus, rather than honor the terms of its universal life insurance policies, Wilco wrongly seeks to shed hundreds of millions of dollars in exposure by raising premiums and the monthly cost of insurance to levels many, if not most, policyholders cannot afford. This is particularly true for Wilco's elderly policyholders, many of whom live on modest fixed-incomes.

**D.     Wilco's Unconscionable Conduct Must Be Enjoined**

89. Through the sudden and massive monthly cost insurance rate increase and the depletion of the cash value of the policies, Wilco is attempting to avoid its obligation to credit the guaranteed interest rates under the policies, and is also attempting to recoup past losses and shed the policies by making the premiums to maintain them cost-prohibitive for policyholders, thereby frustrating policyholders' ability to receive their contractual benefits under the policies.

90. The class members hardest hit by Wilco's unconscionable business practices are policyholders who have dutifully paid premiums for years based on the expectation that in their

twilight years the policies would provide protection for their families. Due to age-related underwriting considerations, life insurance protection for these policyholders is now either unavailable or prohibitively expensive. Compounding this situation is the fact that these policies do not contain an "extension of maturity option" which would provide coverage past age 100. Therefore, it is possible that the insured may outlive the policy and will have paid increased premiums without a way to recover the additional costs. Wilco's actions have thus stripped Plaintiff and other class members of any future life insurance protection and have deprived them of the cash value.

91.    Wilco's attempt to deprive Plaintiff and class members of the primary benefit of their policies—paid for through years of premiums to the accumulation account—violates Wilco's express and implied obligations under the policies. The vast majority of Wilco policyholders affected by this increased COI are policyholders who have faithfully paid the scheduled premiums for years or decades and have accumulated significant cash value in the policies. Due to their advanced age, these individuals cannot obtain alternative life insurance coverage and will lose the cash value of the policy if they cannot pay the increased costs to maintain the policy.

92.    Upon information and belief, Wilco for many years supplied policyholders with illustrations and other information using existing cost of insurance that provided no hint of any impending change in those rates. Current policyholders thus had no way of knowing or expecting that this dramatic increase in the monthly deduction rates would happen after almost twenty years of stable premiums.

93.    These elderly policyholders, who are effectively uninsurable due to their advanced ages, face the prospect of: (a) surrendering their policies and losing their death benefits at an age

when purchasing other life insurance coverage is practically impossible; (b) permitting Wilco to deplete their policy values through its monthly cost of insurance increases until there is nothing left and the policy "shock lapses"; (c) paying vastly increased premiums with no assurance the cost of insurance will not continue to increase; or (d) accepting cuts in death benefits.

94.     As a result of Wilco's actions, thousands of class members are faced with the difficult decision of either paying the exorbitant and unjustified new charges, or forever forgoing the life insurance benefits for which they have dutifully paid premiums for many years.

95.     Plaintiff therefore seeks immediate preliminary injunctive and equitable relief to preserve the status quo *pendente lite* by enjoining the termination of policies due to the monthly cost of insurance rate increases and compelling Wilco to maintain coverage for Plaintiff and members of the Class. Unless Wilco is enjoined, policyholders will be irreparably damaged and Wilco will succeed with its plan to cause mass cancellations of the policies—leaving hundreds or thousands of policyholders without coverage based on an unlawful, unfair and abusive monthly cost of insurance rate increase and Wilco's depletion of the policies' cash value.

96.     Plaintiff also seeks permanent declaratory and injunctive relief requiring Wilco to (i) reverse the unlawful monthly cost of insurance rate increases charged on the policies, and (ii) reinstate all policies that were surrendered or lapsed as a result of the monthly cost of insurance rate increase. Plaintiff also seeks ancillary damages flowing directly from Wilco's unlawful conduct.

## CLASS ACTION ALLEGATIONS

97.     This action is brought by Plaintiff individually and on behalf of the class described below pursuant to Rule 23 (a), (b)(1), (b)(2), and (b)(3).

98.     Plaintiff seeks certification of the following class:

### National Class

    a) All persons who have been subjected to Wilco's recent impermissible cost of insurance increases and/or its depletion of the policies' cash value to cover the cost of insurance increases and/or premium increases, excluding policyholders covered by the settlements in the Lifestyle, LifeTrend, and Valuelife Litigations.

    b) Also excluded from the class are (1) any Judge or Magistrate Judge presiding over this action and their family members; Wilco, and its corporate parents, subsidiaries and affiliates, officers and directors, and any entity in which Wilco has a controlling interest; (3) persons who properly and timely request to be excluded; and (4) the legal representatives, successors, or assigns of any such excluded persons or entities. Plaintiff anticipates the need to potentially amend the class definition after discovery.

99.    There are hundreds, if not thousands, of class members described in the foregoing paragraph. Accordingly, the class consists of hundreds, if not thousands, of Wilco policyholders and are thus so numerous that joinder of all members is impracticable. Although the exact number of members is unknown to Plaintiff at this time, the identities and addresses of the class members can be readily determined from business records maintained by Wilco.

100.    Plaintiff's claims are typical to those belong to class members. Plaintiff's claims stem from Wilco's recent impermissible premium and monthly deduction increases.

101.    Plaintiff will also fairly and adequately protect the interests of the class, and he has retained counsel experienced in complex class action litigation. Plaintiff and his counsel have no interests which are adverse to those belonging to the class that Plaintiff seeks to represent.

### A.    Rule 23(b)(1)

102.    Class action status is warranted under Rule 23(b)(1)(A). The prosecution of separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish

incompatible standards of conduct for Wilco.

103.  Class action status is also warranted under Rule 23(b)(1)(B). The prosecution of separate actions by or against individual class members would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests

**B.    Rule 23(b)(2)**

104.  This action is appropriate as a class action pursuant to Rule 23 (b)(2). Plaintiff seeks injunctive relief and corresponding declaratory relief for the class. Wilco has acted in a manner generally applicable to each member of the class by imposing the monthly cost of insurance rate increases and premium increases on all policies owned by class members.

105.  Wilco's unlawful monthly cost of insurance rates increase, if not enjoined, will subject Plaintiff and other class members to enormous continuing future harm and will cause irreparable injuries to such policyholders, who are compelled to surrender valuable life insurance policies with no economically viable option for alternative life insurance. The adverse financial impact of Wilco's unlawful actions is continuing and, unless preliminarily and permanently enjoined, will continue to irreparably injure Plaintiff and class members.

**C.    Rule 23(b)(3)**

106.  This action is also appropriate as a class action pursuant to Rule 23(b)(3). Common questions of law and fact predominate over any individualized questions. Common legal and factual questions include the following:

    a)    Whether Wilco's premium and monthly cost of insurance rate increases are authorized under the terms of the policies;

    b)    Whether Wilco breached its contractual obligations owed to Plaintiff and class

members;

c)    Whether Wilco breached the implied duty of good faith and fair dealing owed to Plaintiff and class members;

e)    Whether Plaintiff and class members have been damaged, and if so, are eligible for and entitled to compensatory and punitive damages;

f)    Whether Plaintiff and class members are entitled to declaratory relief; and

g)    Whether Plaintiff and class members are entitled to preliminary or permanent injunctive relief, or other equitable relief, against Wilco.

107.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, for the following reasons:

a)    Given the age of class members, many of whom are elderly and have limited resources, the complexity of the issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that Wilco has committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

b)    Once Wilco's liability has been adjudicated respecting the monthly cost of insurance rate increase, claims of all class members can be determined by the Court;

c)    This action will ensure an orderly and expeditious administration of the class's claims and foster economies of time, effort, and expense, and ensure uniformity of decisions and compliance by Wilco with the policies;

d)    Without a class action, many class members would continue to suffer injury, and Wilco's violations of law will continue without redress while it continues to reap and retain the substantial proceeds and reductions in its future liabilities derived from its wrongful conduct; and

e)    This action does not present any undue difficulties that would impede its management by the Court as a class action.

108.    A class action is superior to other available means for the fair and efficient adjudication of this controversy for other reasons as well. The injuries suffered by individual class members are, though important to them, relatively small compared to the burden and

expense of individual prosecution needed to address Wilco's conduct. Individualized litigation presents a potential for inconsistent or contradictory judgments. In contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

109.   Plaintiff cannot be certain of the form and manner of proposed notice to class members until the class is finally defined and discovery is completed regarding the identity of class members.  Plaintiff anticipates, however, that notice by mail or email will be given to class members who can be identified specifically. In addition, notice may be published in appropriate publications, on the internet, in press releases and in similar communications in a way that is targeted to reach class members. The cost of notice, after class certification, trial, or settlement before trial, should be borne by Wilco.

110.   Plaintiff reserves his right to modify or amend the definition of the proposed class at any time before the class is certified by the Court.

## FIRST CLAIM FOR RELIEF

### BREACH OF CONTRACT

111. Plaintiff re-alleges and incorporates the allegations made elsewhere in the Complaint as if set forth fully herein.

112. Plaintiff brings this claim on behalf of himself and the class.

113. The policies are valid, enforceable contracts between Plaintiff and other class members and Wilco.

114.   At all relevant times, Plaintiff and other class members have paid  the premiums to Wilco established at the inception of the policies, and have otherwise performed all their

obligations under the policies.

115.   Wilco owed express duties and obligations to Plaintiff and class members under the policies, including (1) maintaining Planned Premiums, (2) crediting accumulation accounts with guaranteed interest, and (3) refraining from imposing cost of insurance charges and depleting the accumulation account except as authorized. Wilco has dramatically increased premiums and the cost of insurance and has depleted the accumulation account based on impermissible factors and in order to offset its interest obligations, recoup past losses, and ensure a large percentage of policyholders lapse on or surrender their policies. Wilco has materially breached the terms and provisions of the policies and defied policyholders' reasonable expectations by raising Planned Premiums, increasing the cost of insurance rates, and depleting the accumulation accounts.

116.   Moreover, as demonstrated by *Pate*, Wilco has no authority to increase the Planned Premiums agreed to by Plaintiff and other class members. Therefore, the terms of the contract plainly support Plaintiff and should be construed as written to forbid Wilco's premium and cost of insurance rate increases. *Pate*, 971 So.2d at 595-597.

117.   Wilco's conduct and material breaches of the policies have proximately caused damage to Plaintiff and the class members in an amount to be determined at trial.

118.   In addition, unless Wilco is preliminarily and permanently enjoined from continuing to deduct the unlawfully increased cost of insurance rate charges, Plaintiff and class members will suffer severe and irreparable injuries for which they have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

119.  Plaintiff re-alleges and incorporates the allegations made elsewhere in the Complaint as if set forth fully herein.

120.  Plaintiff brings this claim on behalf of himself and the class.

121.  The policies are valid, enforceable contracts between Plaintiff and other class members and Wilco.

122.  Implied in each insurance policy is a contractual covenant of good faith and fair dealing requiring Wilco to act in good faith and deal fairly and in a manner that does not frustrate the reasonable expectations of policyholders like Plaintiff or intentionally deprive policyholders' coverage without a legitimate reason.

123.  Wilco contractually breached the covenant of good faith and fair dealing because, to the extent Wilco had the discretion to increase cost of insurance rates, Wilco exercised its discretion and increased cost of insurance rates to:

    a.    Recoup past losses;

    b.    Force Plaintiff and class members to surrender or lapse on their policies so Wilco would not have to provide further coverage or pay death benefits; and

    c.    Negate the value of what were intended to be guaranteed interest rates, which Wilco has no right to do.

124.  Wilco's contractual breach of the covenant of good faith and fair dealing has proximately caused damage to Plaintiff and the class members in an amount to be determined at the time of trial.

125.  In addition, unless Wilco is preliminarily and permanently enjoined from continuing to deduct the unlawfully increased monthly deduction charges, Plaintiff and class

members will suffer severe and irreparable injuries for which they have no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

### DECLARATORY RELIEF

126.  Plaintiff re-alleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

127.  Plaintiff brings this claim on behalf of himself and the class.

128.  An actual controversy has arisen and now exists between Plaintiff and the class members, on the one hand, and Wilco, on the other hand, concerning the respective rights and duties of the parties under the policies.

129.  Wilco contends that it has (a) lawfully and appropriately increased Planned Premiums and its cost of insurance rates, (b) has appropriately collected (and is still collecting) cost of insurance charges and, (c) it is permitted to continue to collect these charges for the duration of the policies.

130.  On the other hand, Plaintiff and class members maintain that Wilco, through its cost of insurance rate and premium increases, has inappropriately and unlawfully, in material breach of the express and implied terms of the policies, collected inflated cost of insurance charges and premiums.

131.  Plaintiff, on behalf of himself and the class, seeks a declaration as to the parties' respective rights under the policies and requests the Court to declare that the premium and cost of insurance rate increases are unlawful and in material breach of the policies' terms so that future controversies may be avoided.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the class, prays for relief as follows:

    a) An Order certifying this action to proceed on behalf of the class and appointing Plaintiff and his counsel listed below to represent the class;

    b) An Order awarding Plaintiff and class members entitled to such relief restitution and/or disgorgement and such other equitable relief as the Court deems proper;

    c) An Order enjoining Wilco, its representatives, and all others acting with it or on its behalf from unlawfully charging excessive premiums and cost of insurance for the policies and requiring those rates to be at levels that are consistent with the terms of the policies, and other appropriate injunctive relief;

    d) An Order providing preliminary and permanent injunctive relief enjoining Wilco, its representatives, and all others acting with it or on its behalf, from terminating policies while Wilco imposes impermissible cost of insurance charges;

    e) An Order providing a declaration that the cost of insurance rate increases materially breach the policies, and that Wilco must determine the cost of insurance rates only on the grounds authorized under the policies;

    f) An Order awarding Plaintiff and other class members who might be entitled to such relief actual, compensatory, statutory, punitive, and/or exemplary damages;

    g) An Order awarding Plaintiff's attorneys fees and other costs; and

    h) An Order awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b), Plaintiff and the class demand a trial by jury.

Dated: June 11, 2018                Respectfully submitted,

                        By: /s/ Kathleen A. Farinas

                        Kathleen A. Farinas, IN 20283-34
                        **GEORGE & FARINAS, LLP**
                        151 N. Delaware, Ste. 1700
                        Indianapolis, IN 46204
                        Tel: (317) 637-6071/ Fax: (317) 685-6505
                        kf@lgkflaw.com

By:/s/ Stephen J. Fearon, Jr.

Stephen J. Fearon, Jr (subject to *pro hac vice)*
Paul V. Sweeny (subject to *pro hac vice*)
**SQUITIERI & FEARON, LLP**
32 East 57th St., 12th Floor
New York, New NY 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com
Email: paul@sfclasslaw.com

**Attorneys for Plaintiff and the Proposed Class**